E-FILED
Thursday, 07 January, 2016  12:46:00 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| EDWARD C. STEWART, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.   14-cv-1361 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## O R D E R  &  O P I N I O N

This matter is before the Court on Plaintiff's Motion for Summary Judgment (Doc. 12) and Defendant's Motion for Summary Affirmance. (Doc. 14). For the reasons explained below, Plaintiff's motion is denied, and Defendant's motion is granted. The decision of the Administrative Law Judge (ALJ) to deny Plaintiff Social Security Disability benefits is affirmed.

### BACKGROUND

### I.        Procedural History

On May 3, 2011, Plaintiff Edward C. Stewart applied for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, alleging that he became disabled on August 1, 2009. (R. at 160-173).[1] He later amended the alleged onset date to April 4, 2011. (R. at 124). He alleges that he is disabled by a combination of medical problems, including sleep apnea,

---

[1] Citation to R. at ___ refers to the page in the certified transcript of the entire record of proceedings provided by the Social Security Administration.

1

hypertension, paroxysmal atrial fibrillation, arrhythmia, depression, anxiety, diabetes, fibromyalgia, degenerative joint disease, osteoarthritis, and obesity. (R. at 13-14).

The Social Security Administration initially denied his application on August 16, 2011 (R. at 90-91), and denied it again on reconsideration on November 29, 2011. (R at 92-93). Plaintiff requested a hearing before an ALJ on January 6, 2012 (R. at 114-15). An ALJ conducted a hearing on June 12, 2013, at which Plaintiff, represented by counsel, and a Vocational Expert testified. (R. at 31-89).

On July 15, 2013, the ALJ found that Plaintiff was not disabled, and thus not eligible for benefits. (R. at 11-24). The Appeals Council denied Plaintiff's request for review on August 6, 2014, thereby making the ALJ's decision the final decision of the Commissioner of Social Security. (R. at 1-3). Plaintiff then filed his Complaint (Doc. 1) with this Court on September 5, 2014. (Doc. 1).

## II.      Factual Background

Plaintiff was forty-three at the time of the hearing. (R. at 36). He is married and has two children. (R. at 37). He last worked at the Catfish Bend Casino as a dealer, but he lost his job in April of 2011 because he was missing too much work due to back and shoulder pain. (R. at 37, 124). Prior to working as a card dealer, Plaintiff did some work in construction, and also attempted to build a career as a professional bowler. (R. at 66).

Plaintiff presented evidence that he suffers from a variety of ailments that are relevant to this Opinion. First, Plaintiff has a history of sleep apnea and heart

problems, including hypertension, arrhythmia, and paroxysmal atrial fibrillation. (R. at 476, 504, 714). In February of 2011, he was hospitalized for a day with acute atrial fibrillation. (R. at 354). He had a sleep study done on February 21, 2011, shortly after his discharge from the hospital, which revealed that he suffers from "severe obstructive sleep apnea." (R. at 616). He was hospitalized for atrial fibrillation for a second time on July 2011. (R. at 504-09). After Plaintiff underwent a transthoracic echocardiogram study on August 15, 2011 (R. at 516), Dr. Madhu Dukkipati opined that Plaintiff's atrial fibrillation is related to his sleep apnea. (R. at 519). Plaintiff has treated his sleep apnea by using a CPAP machine during the night,[2] and Dr. Dukkipati found on September 7, 2012 that Plaintiff was "quite stable from a cardiac standpoint," and did not have any "recurrence of paroxysmal atrial fibrillation after therapy." (R. at 716).

Plaintiff also has a history of limitations associated with fibromyalgia. In March of 2011, he complained to Dr. Michael Holden of joint pain in his shoulders and hips. (R. at 354). He explained to Dr. Holden that his body became extremely sore when he dealt cards at his job as a casino dealer. (*Id.*). On examination, Plaintiff's proximal muscles were very weak, as Dr. Holden could "easily push his arms down." (*Id.*). However, Plaintiff was able to make a fist, open and close his hands, and had a good range of motion. (*Id.*). Plaintiff also had a difficult time

---

[2] A CPAP (or "continuous positive airway pressure") machine commonly treats sleep apnea by using "mild air pressure to keep the airways open." *What is a CPAP*, https://www.nhlbi.nih.gov/health/health-topics/topics/cpap (last visited Jan. 5, 2016).

transitioning from a seated position to a standing position, showed "slight weakness in the dorsiflexion strength" of his feet, and had some difficulty walking. (R. at 355).

Plaintiff had a rheumatology consultation with Kathleen L. Voelker on June 22, 2011 for degenerative joint disease, shoulder pain, and fibromyalgia. (R. at 461-65). He complained of "widespread pain symptoms for about three years." (R. at 461). Voelker's examination revealed that Plaintiff had good strength and reflexes in his upper and lower extremities, good grip strength, and good spinal flexion and extension. (R. at 463-64). Spinal x-rays showed mild degeneration in the lumbar spine and mild cervical straightening, and an x-ray of his right hip showed minimal osteoarthritis. (R. at 464). Voelker also checked for tenderness in soft-tissue areas throughout Plaintiff's body. (*Id.*). She diagnosed fibromyalgia, as Plaintiff had tenderness in fourteen of the eighteen tender points. (*Id.*). She concluded that Plaintiff's pain symptoms are related to fibromyalgia and mild osteoarthritis in his low back and hips. (R. at 465).

Dr. Sadia Ali conducted a consultative examination of Plaintiff on June 24, 2011. (R. at 473-76). She observed that Plaintiff had good grip strength, could perform toe/heel walk, could grasp and manipulate objects, could fully extend his hands, make fists, and appose his fingers. (R. at 475). Moreover, Plaintiff's range of motion in his shoulders, elbows, wrists, hips, knees, and ankles, lumbar spine, and cervical spine was not limited, although Plaintiff complained that moving his hips, knees, and ankles caused him pain. (*Id.*). Plaintiff was tender at the fibromyalgia trigger points. (*Id.*).

Plaintiff routinely saw Monica Crim, an Advance Practice Nurse, from July 2011 through August 2012 to receive treatment for sleep apnea, atrial fibrillation, and pain. Plaintiff reported to her in August of 2011 that he slept inconsistently while using the CPAP machine (R. at 542), and reported daytime fatigue and difficulty falling asleep at night in March of 2012. (R. at 621).

Plaintiff routinely reported that he experienced pain and tenderness in his hands, shoulders, legs, hip, and neck. (*See, e.g.*, R. at 540, 621, 626, 630, 633, 706). For example, in August of 2011, Crim observed that Plaintiff had a decreased range of motion in his right shoulder, and experienced pain with manipulation. (R. at 540). In November of 2011, Plaintiff complained that he had a sore hip that kept him from doing his daily activities, and she noted that he had tenderness on the outside of his left leg. (R. at 630). And, in August of 2012, Crim observed that Plaintiff was having muscle spasms in his back and had points of tenderness. (R. at 707). On November 15, 2012, Crim described Plaintiff's fibromyalgia as "stable," and observed that he had a limited range of motion in his back and experienced pain during a straight leg raising test. (R. at 693).

At one point, Crim and Plaintiff discussed the possibility of joint injections for shoulder pain (R. at 633). Crim also filled out paperwork for a TENS unit to treat his back and neck pain. (R. at 684).[3] Crim recommended physical therapy for Plaintiff's right shoulder pain, which Plaintiff received for a month from December

---

[3] A TENS (or transcutaneous electrical nerve stimulation) unit treats back pain with low voltage electric current. *TENS for Back Pain*, http://www.webmd.com/back-pain/guide/tens-for-back-pain (last visited Jan. 5, 2016).

2011 through January 2012. (R. at 649-66).  He began a month of physical therapy for back and shoulder pain in May of 2012, but did not complete it. (R. at 635-48).

Crim also treated Plaintiff for diabetes beginning in October 2012. (R. at 700-01). He initially complained of polydipsia (excessive thirst) and moderate polyuria (excessive urination) (R. at 699), and Crim diagnosed him with uncontrolled type II diabetes mellitus on October 10, 2012. (R. at 701). On November 15, 2012, Crim reported that his diabetes was "[c]ontrolled with medications." (R. at 693). She recommended that Plaintiff control his diabetes by losing weight. (R. at 698).

### III.      Hearing testimony

Plaintiff testified before the ALJ on June 12, 2013. (R. at 33). At the time of the hearing, Plaintiff, who is 6'3", weighed 302 pounds. (R. at 37-38). He testified that he had lost 60 pounds since April 4, 2011. (R. at 38). He attributes the weight loss to a change of diet following his diabetes diagnosis. (R. at 62).

Plaintiff first testified about symptoms caused by diabetes, fibromyalgia, degenerative disc disease, arthritis, sleep apnea, fibrillation, and anxiety/panic. (R. at 40-52; 55-56). He testified that because of diabetes, he experiences dizziness about five times a week for a couple of hours at a time. (R. at 40-41). He combats the dizziness (which is accompanied by shakes, sweats, and blurry vision) by eating something and then lying down for two to three hours. (*Id.*). Plaintiff also testified that his diabetes medication, Metformin, causes him to have diarrhea and cramping three or four times a week. (R. at 46). On those days, he has the sudden urge to use the toilet five or six times a day.  (*Id.*).

6

He testified that his neck has been "constantly tight" for a couple of years. (R. at 42). His fibromyalgia also affects his shoulders, chest, back, hands, and feet. (*Id*.). He said he experiences constant tightness in his shoulders and chest, which he described as a "burning, numbish kind of feeling," (R. at 42-43). He experiences pain that "shoots down [his] shoulder blades" about half way down his back "all the time." (R. at 43). And he "lose[s] gripping power" in his hands every day, though that will "come and go." (R. at 44). He said that on the typical day, he has difficulty with his hands for between nine and ten waking hours. (*Id*.). The difficulty prevents him from holding a bag of chips, and causes him to frequently drop things. (*Id*.). He said he also has numbness and tingling in his feet for four to five hours a day, which his doctors have attributed to his fibromyalgia and diabetes. (R. at 50).

Plaintiff also said he suffers from lower back pain due to degenerative disc disease and arthritis. (R. at 47). He was standing during the hearing because of the pain in his lower back. (*Id*.). Plaintiff testified that the lower back pain travels down his left leg to around his knee when he is standing for longer than fifteen minutes, and causes his leg to go numb. (R. at 48-49). He treats his lower back and hip pain with a TENS unit twice a day, in the early morning and in the evening. (R. at 49). He also takes Vicodin for pain. (R. at 56).

Plaintiff testified that he uses a CPAP and oxygen for his sleep apnea, and had been using each for two years at the time of the hearing. (R. at 51-52). He said he wakes up between three and four times a night either because he is gasping for air or has soreness in his back, and is left with no energy during the day. (R. at 52).

Plaintiff also testified that he has fibrillation a couple of times a month, and feels like he is having a heart attack. (R. at 44-45). His said his chest gets tight, his heart starts racing, and he gets dizzy. (R. at 45). Finally, Plaintiff testified that he has panic attacks five or six times a month and anxiety attacks (which are worse than panic attacks) about three times a month. (R. at 55). He attempts to control them by taking Xanax. (R. at 56).

Plaintiff testified that these ailments result in substantial limitations on his ability to do things during the day. He has some difficulty putting on his socks and shoes and also has difficulty bathing himself due to pain. (R. at 57).  He said that he takes one to two naps a day; the first is a voluntary three-hour nap in the late morning or early afternoon, and the second is an involuntary nap. (R. at 52-53). On days when he has taken Xanax for panic or anxiety and Vicodin for pain, he feels comatose. (R. at 57).

During the day, Plaintiff will do some dishes and may do laundry. (R. at 54). He estimates that he can lift about ten pounds at a time, which is about the weight of a load of laundry. (R. at 60). Other than that he said he spends most of his time sitting on the couch watching TV. (R. at 54). He estimates that he lies down between three and four hours during a typical eight-hour work day (R. at 58), and can only sit comfortably for about fifteen or twenty minutes before needing to either lie down or stand. (R. at 59). He estimated that he can stand for about an hour and a half over an eight-hour day, and can walk for about five minutes before needing to

stop and sit or lie down. (*Id*.). He smokes about half a pack of cigarettes a day, (R. at 60), and does some light exercises. (R. at 67).

Plaintiff said that he leaves the house (and drives) about four times a week. (R. at 64). He watches his kids when they are out of school during the summer, and takes them on errands and to their appointments. (R. at 63-64).

After Plaintiff's testimony, a Vocational Expert gave testimony on two hypotheticals provided by the ALJ. (R. at 70-87). For her first hypothetical, the ALJ hypothesized an individual who is Plaintiff's age, and has Plaintiff's work experience and education. (R. at 71). The person is, among other things, limited to sedentary work, can lift up to ten pounds, can frequently lift and carry less than ten pounds, can stand two hours out of an eight hour work day, sits for six hours out of an eight hour work day, and needs to alternate between sitting and standing every thirty to forty-five minutes for a few minutes at a time. (*Id*.).[4]

In response to this hypothetical, the Vocational Expert testified that such a person would be unable to do any of Plaintiff's past work but could find work as an assembler of optical goods, an operator of an addressing machine, and an assembler of electric circuit boards. (R. at 72-73). Although the Dictionary of Occupational Titles does not address the sit/stand requirement that the ALJ included as part of her hypothetical, the Vocational Expert said his experience suggests that

---

[4] The ALJ included other limitations, including "occasional climbing, balancing, kneeling, crouching, crawling, and stooping," and some environmental restrictions, including the "need to avoid concentrated exposure to temperature extremes, vibration, and work hazards, such as unprotected heights and being around dangerous moving machinery." (R. at 72).

supervisors would allow an employee to adjust positions every thirty to forty minutes. (R. at 72, 74).

For her second hypothetical, the ALJ hypothesized a more limited person, who has "minimal standing and walking," must spend "eight hours out of an eight hour day sitting," needs "to alternate sit to stand" every fifteen to twenty minutes, and has some manipulation restrictions. (R. at 74-75). The Vocational Expert testified that any manipulation restrictions would preclude employment. (R. at 75). He also testified that in his experience, it is likely that the need to change from a seated position to a standing position every fifteen to twenty minutes would preclude employment or would at least be "very, very close." (*Id.*).

The ALJ then modified the second hypothetical so that it was identical to the first hypothetical in all respects except the person was limited to minimal standing and walking. (R. at 77). Here, the Vocational Expert provided contradictory testimony. First, he testified that such a person would have the same opportunities as the first hypothetical person. (*Id.*). Then, in response to questioning from Plaintiff's attorney, the Vocational Expert testified that such a person would be precluded from sedentary employment because sedentary employment "requires that [a person] be able to stand up to two hours." (R. at 81-82, 84). Finally, on re-examination by the ALJ, he "corrected" himself, and testified that the Dictionary of Occupational Titles "allow[s] up to, [but] doesn't require two hours" of standing and walking. (R. at 85).

10

## IV.      The ALJ's Decision

The ALJ issued her decision on July 15, 2013. (R. at 11-24). At step one, she found that Plaintiff had not engaged in substantial gainful activity since April 4, 2011. (R. at 13). At step two, she found that Plaintiff had a number of severe impairments: fibromyalgia, degenerative joint disease and osteoarthritis, diabetes mellitus, and obesity. (*Id.*). However, she found that other of Plaintiff's complained of impairments, including sleep apnea, hypertension, paroxysmal atrial fibrillation, arrhythmia, depressive disorder, and anxiety disorder, were non-severe. (R. at 14-16). At step three, the ALJ found that Plaintiff's impairments or combination of impairments did not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 16).

The ALJ determined that Plaintiff has the residual functional capacity to perform sedentary work as it is defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), "except that he can occasionally lift up to 10 pounds and can frequently lift and carry less than 10 pounds; he can stand and/or walk up to 2 hours in an 8-hour workday; he can sit up to 6 hours in an 8-hour workday, with the need to alternate sitting and standing every 30-45 minutes; he can occasionally climb, balance, kneel, crouch, crawl and stoop;" and "he should avoid concentrated exposure to temperature extremes, vibration and work hazards such as unprotected heights and being around dangerous moving machinery." (R. at 16). In reaching this residual functional capacity, the ALJ noted that Plaintiff had been diagnosed with fibromyalgia, degenerative joint disease, and osteoarthritis, but concluded that the

11

medical evidence did not support a finding of disabling limitations. (R. at 18). She then concluded that Plaintiff's complaints of pain were not entirely credible. (R. at 18-19; 20-21). The ALJ also considered Plaintiff's diabetes mellitus, and found that the impairment "does not result in more limitations than provided in the residual functional capacity." (R. at 19).  In reaching this conclusion, she relied on Plaintiff's medical records that suggested that his diabetes is well-controlled. (*Id.*).

The residual functional capacity that the ALJ determined conflicted with the opinion of Plaintiff's treating advance practice nurse, Monica Crim. (R. at 21-22). Crim completed a Medical Source Statement in which she opined that Plaintiff could only occasionally reach and handle objects, and needed to alternate between sitting and standing every ten to fifteen minutes. (R. at 21, 668-71). The ALJ gave little weight to Crim's opinion, as she found that it was not supported by objective evidence in the record. (R. at 21-22).

The ALJ relied upon that residual functional capacity to determine at step four that Plaintiff is unable to perform past relevant work. (R. at 22). At step five, the ALJ determined that jobs exist in significant numbers in the national economy for a person of Plaintiff's age, education, work experience, and residual functional capacity.

## LEGAL STANDARD

### I.        Standard of Review

The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g). "The standard of review that governs decisions in disability-benefit cases is

deferential." *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). When a claimant seeks judicial review of an ALJ's decision to deny benefits, this Court must only "determine whether [the ALJ's decision] was supported by substantial evidence or is the result of an error of law." *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). "The findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). "Substantial evidence, 'although more than a mere scintilla of proof, is no more than such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001) (citations omitted).

To determine whether the ALJ's decision is supported by substantial evidence, this Court will review the entire administrative record, but will not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). While this Court must ensure that the ALJ "build[s] an accurate and logical bridge from the evidence to [her] conclusion," she need not address every piece of evidence. *Clifford*, 227 F.3d at 872. The Court will remand the case only where the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## II.      Disability Standard

To be entitled to disability benefits under the Social Security Act, a claimant must prove he is unable to "engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). The Commissioner must make factual determinations in assessing the claimant's ability to engage in substantial gainful activity. *See* 42 U.S.C. § 405(b)(1). The Commissioner applies a five-step sequential analysis to determine whether the claimant is entitled to benefits. 20 C.F.R. § 404.1520; *see also Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir. 1999).[5] The claimant has the burden to prove disability through step four of the analysis, i.e., he must demonstrate an impairment that is of sufficient severity to preclude him from pursuing his past work. *McNeil v. Califano*, 614 F.2d 142, 145 (7th Cir. 1980). If the plaintiff has carried his burden for the first four steps, the burden shifts to the Commissioner at step five. *Id.*

In the first step, a threshold determination is made as to whether the claimant is presently involved in a substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not under such employment, the Commissioner of Social Security proceeds to the next step. *Id.* At the second step, the Commissioner evaluates the severity and duration of the impairment. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant has an impairment that significantly limits his physical or mental ability to do basic work activities, the Commissioner will proceed to the next step. 20 C.F.R. § 404.1520(c). If the claimant's impairments, considered

---

[5] Because Plaintiff applied for benefits under both title II and title XVI of the Social Security Act, two different parts of the Code of Federal Regulations apply. However, the relevant regulations are virtually identical. Therefore, the Court will cite only to the regulations for title II (20 C.F.R. §§ 404.1500–.1599), and omit the citation to the regulations for title XVI (20 C.F.R. §§ 416.900-.999d) unless there is a notable difference.

in combination, are not severe, he is not disabled and the inquiry ends. *Id.* At the third step, the Commissioner compares the claimant's impairments to a list of impairments considered severe enough to preclude any gainful work; if the elements of one of the Listings are met or equaled, the claimant is eligible for benefits. 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Part 404, Subpt. P, App. 1.

If the claimant does not qualify under one of the listed impairments, the Commissioner proceeds to the fourth and fifth steps, after making a finding as to the claimant's residual functional capacity.  20 C.F.R. § 404.1520(e). At the fourth step, the claimant's residual functional capacity is evaluated to determine whether he can pursue his past work. 20 C.F.R. §§ 404.1520(a)(4)(iv). If he cannot, then, at step five, the Commissioner evaluates the claimant's ability to perform other work available in the economy, again using his residual functional capacity. 20 C.F.R. § 404.1520(a)(4)(v).

### DISCUSSION

Plaintiff raises two major challenges to the ALJ's decision. First, he argues that the ALJ erred in determining his residual functional capacity by improperly assessing the opinion of Monica Crim. Second, he argues that the ALJ erred at step five. As explained below, the ALJ did not err in either respect.

### I.      The ALJ did not err in her assessment of Monica Crim's opinion

Plaintiff argues that the ALJ improperly weighed the opinion of Monica Crim.  Crim provided a Medical Source Statement on August 14, 2012 in which she opined that Plaintiff (1) is limited to carrying ten pounds; (2) can stand for less than

15

two hours in an eight hour day; (3) must periodically (every 10-15 minutes) alternate between sitting and standing; (4) is limited to occasionally climbing, balancing, kneeling, crouching, crawling, and stooping; (5) has a limited ability to reach over his head and handle objects, push and pull objects, and manipulate objects; and (6) should have limited exposure to temperature extremes, vibrations, and hazards like height. (R. at 668-71). Her opinion was based upon medical and clinical findings of fibromyalgia, degenerative disc disease, back pain, and weakness. (R. at 669).

The ALJ determined that Plaintiff has a residual functional capacity that was largely similar to Crim's Medical Source Statement, but differed in a few substantial ways. Namely, the ALJ concluded that Plaintiff (1) could stand or walk for up to two hours in a day and sit for six hours; (2) must periodically (every 30-45 minutes) change his position; and (3) did not have reaching, handling, pushing, pulling, and manipulation restrictions. (R. at 16). Plaintiff argues that the ALJ was required to give Crim's opinion controlling weight. As a fallback, he argues that the opinion was at least entitled to great weight.

## A. Crim's opinion is not entitled to controlling weight

According controlling weight to Crim's opinion would be contrary to the Social Security Administration's regulations because she is not an acceptable medical source as that term is defined. Only "acceptable medical sources" can provide controlling medical opinions. 20 C.F.R. § 404.1527(a)(2), (c)(2). The regulations define acceptable medical sources as "[l]icensed physicians," "[l]icensed

or certified psychologists," "[l]icensed optometrists," "[l]icensed podiatrists," and "[q]ualified speech-language pathologists." *Id.* at § 404.1513(a). Physicians' assistants are specifically excluded from the category of acceptable medical sources, and are instead considered "other sources." *See id.* at § 404.1513(d). As Crim is an advanced practice nurse, she is an other source who cannot provide a medical opinion that is entitled to controlling weight. *See* 20 C.F.R. §§ 404.1513(a),(d); 404.1527(a)(2),(c)(2).

Plaintiff asks that the Court disregard the distinction that the regulations draw, and instead find that Crim can offer a medical opinion because of the privileges that advance practice nurses are afforded under Illinois law. Plaintiff notes that advance practice nurses may enter into collaborative agreements with physicians to diagnose and treat patients, and can practice rather independently through this collaboration. (Doc. 12 at 7-8). Although advance practice nurses are "subject to periodic review" by collaborating physicians, their ordinary scope of practice involves the type of responsibilities that one might attribute to a physician, including diagnosing ailments and prescribing treatment. (*Id.* at 8 (citing 225 Ill. Comp. Stat. § 65/65-30)). Plaintiff argues that "[t]he control of the practice of medicine" is a function that is reserved for the state government, and the Social Security Administration's decision to not consider nurse practitioners' opinions to be medical opinions "usurps the function of the state legislature in determining who may provide medical services." (Doc. 12 at 7, 8).

Plaintiff's argument is unpersuasive. Although the underlying policy judgment that animates the Social Security Administration's regulation may be in tension with the underlying policy judgment that animates Illinois law, a court's decision to follow Social Security Administration regulations would not conflict with these Illinois laws. Just as the Social Security Administration distinguishes between physicians' assistants and physicians, so does Illinois. As Illinois law makes clear, advance practice nurses are not considered physicians, and physicians must review their work. *See, e.g.,* 225 Ill. Comp. Stat. § 65/65-40 (describing written collaborative agreements between physicians and advance practice nurses); 225 Ill. Comp. Stat. § 65/65-45 (describing role of advance practice nurses in a hospital setting, where they are supervised by attending physicians). Further, the Social Security Administration's regulations in no way limit the authority that advance practice nurses enjoy under Illinois law. Indeed, Crim diagnosed Plaintiff with a variety of ailments, provided him with treatment, and prescribed him medication, just as Illinois law permits her to do. The Social Security Administration has simply concluded that advance practice nurses cannot provide it with medical evidence that a person has an impairment or a medical opinion as to the severity of the person's impairment. *See* 20 C.F.R. §§ 404.1513(a), 404.1527(c).

Were there to be a conflict, however, the Constitution's Supremacy Clause would demand that the state law surrender to the Social Security Administration's regulations. *See* U.S. Const. Art. VI, cl. 2; *Patriotic Veterans, Inc. v. Ind.*, 736 F.3d 1041, 1050 (7th Cir. 2013)(explaining that the Supremacy Clause requires that

18

state law yield to federal regulation when it would "do 'major damage' to clear and substantial federal interests.").

### B. The ALJ did not err in failing to afford great weight to Crim's opinion.

Just because opinions like Crim's are not entitled to controlling weight does not mean that ALJs are free to disregard them. As the Social Security Administration has recognized, "[w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' such as nurse practitioners [and] physician assistants . . . have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists." SSR 06-03p, 2006 WL 2329939, at *3. In light of this, these opinions "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.* In evaluating these opinions, ALJs can apply the same factors that they consider in evaluating the opinions of acceptable medical sources, including: the length and frequency of the treatment relationship, the opinion's consistency with other evidence, whether the opinion is supported by relevant evidence, the strength of the opinion's explanation, and whether the source has applicable expertise. *Id.* at *4.

Plaintiff argues that even if the ALJ was not required to give Crim's opinion controlling weight, she should have given Crim's opinion substantial weight. The ALJ gave little weight to Crim's opinion. (R. at 21-22). She rejected her opinion that Plaintiff could only occasionally reach or handle objects and could not sit or stand

for longer than 10-15 minutes at a time as unsupported by objective medical evidence. (R. at 21). The ALJ discounted Crim's opinion regarding Plaintiff's ability to reach or handle objects by noting that diagnostic imaging of Plaintiff's hands has been normal, and also citing evidence that Plaintiff has full range of motion and strength in his hands bilaterally. (R. at 21-22). The ALJ also discounted Crim's opining regarding Plaintiff's need to alternate positions between sitting and standing every ten to fifteen minutes, finding that it is unsupported by objective medical evidence of pain. (R. at 22).

The Seventh Circuit upholds "all but the most patently erroneous reasons" for discounting opinions such as treating physician's assessments. *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015). An ALJ may discount an opinion if she finds that it is inconsistent with other evidence in the record. *See Simila v. Astrue*, 573 F.3d 503, 515 (7th Cir. 2009). Indeed, ALJs may discount the opinion of a treating physician if it is "inconsistent with the consulting physician's opinion, internally inconsistent, or based solely on the patient's subjective complaints." *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008). So long as the ALJ's reasons for discounting Crim's opinion supported by the record and logical, her rejection of it (which was not a treating physician's opinion) meets these standards. *See Simila*, 573 F.3d at 515; *Ketelboeter*, 550 F.3d at 625.

## 1.  **Plaintiff's ability to reach and handle objects**

The ALJ reasonably concluded that Crim's opinion that Plaintiff could only occasionally reach and handle objects was not supported by the objective evidence in

the record. On August 29, 2012, Plaintiff had diagnostic images taken of both his left and his right hands. (R. at 608-09). None of the images showed fractures or lesions, and the radiocarpal and phalangeal relationships were normal. (*Id.*). Dr. Ali examined Plaintiff on June 24, 2011 and found that he had "5/5 grip strength in both hands," "normal ability to grasp and manipulate objects," and the ability "to fully extend the hands, make fists and appose the fingers."  (R. at 475).

Plaintiff argues that the ALJ did not address certain record evidence that shows he could only occasionally reach and handle objects.  Specifically, the ALJ did not discuss Plaintiff's March 15, 2011 visit with Dr. Holden.  ALJ's are not required to address each piece of evidence on the record, they are just required to "articulate some legitimate reason" for their decision. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).  Although ALJs cannot dismiss a line of contrary evidence without discussion, they are not required "to discuss every snippet of information from the medical record that might be inconsistent with the rest of the objective medical evidence." *Pepper v. Colvin*, 712 F.3d 351, 363 (7th Cir. 2013).

Dr. Holden's notes do not represent a line of ignored contrary evidence. Although Holden noted that Plaintiff had proximal muscle weakness, he also observed that Plaintiff had "good range of motion," could "raise his arms over his head," and had "better strength in his distal muscles" and was "able to make a fist with his hands and open and close his hands with reasonable motor strength." (R. at 354). These findings – first, that Plaintiff had strength in his distal muscles and could open and close his hands, and second, that Plaintiff had a good range of

motion and could raise his arms – do not contradict the ALJ's finding that Plaintiff could reach his hands, and grab and manipulate items with them. Therefore, the ALJ did not err by reasoning that Crim's opinion was not supported by objective medical evidence. *See Pepper*, 712 F.3d at 363.

### 2. Plaintiff's need to alternate positions

Plaintiff fares no better with respect to his claim that he must alternate positions every ten to fifteen minutes, as the ALJ also found that this opinion was not supported by objective medical evidence. (R. at 21-22). Earlier in her opinion, the ALJ reasoned that Plaintiff's musculoskeletal ailments are classified as mild, and observed that Plaintiff's consultative examinations and other physical examinations confirmed normal findings. (R. at 18). These accurate findings provide a proper basis for discounting Crim's opinion. *See Simila*, 573 F.3d at 515.

Plaintiff attempts to show that the ALJ erred in discounting Crim's opinion with respect to both of these limitations by engaging in an unhelpful recitation of his medical history. It is unhelpful first because it focuses on certain of Plaintiff's ailments that did not form the basis of Crim's opinion. Plaintiff attempts to support Crim's opinion by pointing to his history of sleep apnea, atrial fibrillation, Chronic Obstructive Pulmonary Disease, diabetes, and a cyst, along with treatment that he received for each of these ailments. (*See* Doc. 12 at 9-11). Crim's opinion, however, was not based upon any of these ailments. (*See* R. at 669). Moreover, the ALJ found that Plaintiff's heart condition and sleep apnea were not severe at step two of the sequential analysis, and found that Plaintiff's diagnosis for diabetes didn't "result in

more limitations than provided in the [RFC]." (R. at 14, 19). Plaintiff's argument is unavailing, as he has not challenged either of these determinations, and he has not presented any argument that this medical evidence even contradicts the residual functional capacity developed by the ALJ.

Second, it is unhelpful because it details Plaintiff's regular subjective complaints of pain.  In situations where a source's opinion is based upon a claimant's subjective complaints of pain, the question of whether to credit it "collapses into a credibility issue." *Bates v. Colvin*, 736 F.3d 1093, 1100 (7th Cir. 2013). In such cases, ALJs do not err in discounting an opinion when they made a proper credibility determination. *See id.*  The ALJ specifically considered Plaintiff's credibility, noting that "it is likely that the claimant is experiencing some degree of pain; the real issue is how severe that pain is." (R. at 18). Ultimately, the ALJ found a number of reasons to discount Plaintiff's credibility, including his relatively conservative treatment, his vacation to Disney World, and his non-compliance with treatment. (R. at 18-19).

Although Plaintiff relies upon his reports of pain in an effort to bolster Crim's opinion, he has not challenged the ALJ's assessment of his credibility. Therefore, he has waived that point and cannot rely upon his reports of pain as evidence that Crim's opinion is entitled to more weight. *See Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Williams v. Colvin*, No. 14-CV-768-SMY-CJP, 2015 WL 1867058, at *8 (S.D. Ill. Apr. 22, 2015) ("As plaintiff relies heavily on his testimony and self-reported complaints to doctors for his RFC arguments, it is important to note the

ALJ's credibility analysis. . . Plaintiff did not challenge this determination and therefore waived any arguments regarding his credibility.").

For all of these reasons, the Court concludes that the ALJ correctly declined to provide Crim's opinion with controlling weight and did not err in her decision to give the opinion little weight.

## II.   The ALJ did not err at step five

Plaintiff next argues that the ALJ erred at step five of her analysis, in which she determined that Plaintiff could perform work that exists in significant numbers in the national economy.

The Commissioner has the burden of "providing evidence that demonstrates that other work exists in significant numbers in the national economy that [a claimant] can do, given [his] residual functional capacity and vocational factors." 20 C.F.R § 404.1560(c)(2). An ALJ can rely upon the testimony of a Vocational Expect to meet this burden if the testimony is reliable. *Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008).  A finding based upon unreliable testimony from a Vocational Expert is "equivalent to a finding that is not supported by substantial evidence and must be vacated." *Id.* (quoting *Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008)).

The ALJ relied upon the Vocational Expert's testimony, which Plaintiff argues was unreliable because it was too contradictory and based upon inadequate hypotheticals. As explained below, the Court concludes that the ALJ did not err at step five.

### A. The Vocational Expert's contradictory testimony

First, Plaintiff challenges the reliability of the Vocational Expert's testimony because it was both contradictory and convoluted. The ALJ posed two hypotheticals to the Vocational Expert. Although the Vocational Expert provided clear and unambiguous testimony in response to the first hypothetical, he provided contradictory testimony in response to questions about the second hypothetical. *See supra* at 10.

The residual functional capacity that the ALJ determined in her opinion is consistent with the first hypothetical. Plaintiff's argument is unpersuasive because the ALJ did not rely upon the portions of the Vocational Expert's testimony that Plaintiff argues are unreliable. Instead, the ALJ relied upon the Vocational Expert's unchallenged testimony in response to her first hypothetical, which she was entitled to do. *See Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004); *Zblewski v. Astrue*, 302 F. App'x 488, 494 (7th Cir. 2008).

### B. The ALJ's first hypothetical was complete

Next, Plaintiff argues that the hypotheticals posed by the ALJ to the Vocational Expert failed to account for a number of his disqualifying limitations. "As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). But, "the ALJ is required only to incorporate into [her] hypotheticals those impairments and

limitations that [she] accepts as credible." *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009).

Plaintiff argues that he must take unscheduled breaks because of diarrhea and blurry vision caused by diabetes.[6] If the ALJ had concluded that Plaintiff's diabetes caused blurry vision and diarrhea that necessitated unscheduled breaks from work, she would have erred by not including these limitations as part of her hypothetical to the Vocational Expert. *See id.*; *Yurt*, 758 F.3d at 857, 859.

But, Plaintiff's argument fails because the ALJ adequately considered these complained-of-limitations and articulated a residual functional capacity based upon them that does not include the need to take unscheduled breaks. The ALJ concluded that the medical evidence on record did not support Plaintiff's claims of blurry vision and diarrhea. (R. at 19). She discussed the symptoms that Plaintiff attributed to diabetes. (*Id.*). However, she pointed to evidence that his diabetes was "described as without complications and controlled with medication," and therefore declined to find that diabetes caused him any additional limitations. (*Id.*). Furthermore, as discussed above, the ALJ discounted Plaintiff's credibility. (R. at 18-19).

---

[6] Plaintiff makes two additional arguments that require little discussion. First, he argues that he needs to take unscheduled breaks to use his TENS unit, which is meant to provide relief for his lower back pain. (R. at 49-50). The record does not support this argument. Plaintiff testified that he uses the TENs unit twice a day – once at 7 a.m. and again at 6 p.m. (R. at 49). Second, he also notes that the Vocational Expert opined that a person with Plaintiff's acknowledged limitations who also had a manipulation restriction would be disabled. He then, once again, argues that the ALJ erred by not incorporating a manipulation restriction into his residual functional capacity. This argument is no different from the one that the Court has already considered and rejected above. *See supra* at 20-22.

Plaintiff has not challenged the ALJ's findings with respect to his diabetes symptoms, nor has he challenged the ALJ's assessment of his credibility. Instead, he seems to assume that his complaints of blurred vision and diarrhea constitute the sort of medical evidence that the ALJ must incorporate into hypotheticals for the Vocational Expert. They do not. The ALJ did not err by failing to include the need to take unscheduled breaks in the hypothetical she posed to the Vocational Expert. She properly concluded it is not supported by medical evidence and she did not find the need to be credible. *See Yurt*, 758 F.3d at 857-59; *Simila*, 573 F.3d at 521.

### CONCLUSION

For the foregoing reasons, the Commissioner's decision denying disability benefits is affirmed. IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment (Doc. 12) is DENIED, and Defendant's Motion for Summary Affirmance (Doc. 14) is GRANTED. CASE TERMINATED.

Entered this 7th day of January, 2016.

s/Joe B. McDade
_____
JOE BILLY McDADE
United States Senior District Judge
